**Eloise Pepion COBELL, et al., Plaintiffs,**

v.

**Gale NORTON, Secretary of the Interior, et al., Defendants.**

No. CIV. A. 1:96CV1285(RCL).

United States District Court, District of Columbia.

Feb. 5, 2002.

Keith M. Harper, Lorna K. Babby, Washington, DC, Dennis Marc Gingold, Washington, DC, Elliott H. Levitas, Kilpatrick Stockton, LLP, Washington, DC, for plaintiffs.

Robert D. Luskin, Patton Boggs, L.L.P., Washington, DC, Tom C. Clark, U.S. Dept. of Justice, Land & Nat. Resources Div., Washington, DC, Brian L. Ferrell, Andrew M. Eschen, U.S. Dept. of Justice, Washington, DC, Charles Walter Findlay, III, Sarah D. Himmelhoch, Washington, DC, Sandra Marguerite Schraibman, U.S. Dept. of Justice, Fed. Programs Branch, Washington, DC, Edith R. Blackwell, Washington, DC, John Charles Cruden, U.S. Dept. of Justice, Environment & Natural Resources Div., Annandale, VA, for Bruce Babbitt, defendant.

Charles Walter Findlay, III, Washington, DC, John Charles Cruden, U.S. Dept. of Justice, Environment & Nat. Resources Div., Annandale, VA, for Lawrence Summers, defendant.

Mark E. Nagle, Robert Craig Lawrence, Scott Sutherland Harris, U.S. Attorney's Office, Washington, DC, J. Christopher Kohn, U.S. Dept. of Justice, Commercial Lit. Branch, Washington, DC, John Most, U.S. Dept. of Justice, Environment & Natural Resources Div., Washington, DC, Brian L. Ferrell, U.S. Dept, of Justice, Washington, DC, Charles Walter Findlay, III, Washington, DC, Jo–Ann Shyloski, Barry Weiner, Washington, DC, Terry M. Petrie, U.S. Dept. of Justice, Denver, CO, Seth Brandon Shapiro, John Stemplewicz, U.S. Dept. of Justice, Civ. Div., Washington, DC, Sandra Peavler Spooner, Peter Blaze

Miller, Cynthia L. Alexander, Amalia D. Kessler, Mathew J. Fader, U.S. Dept. of Justice, Commercial Lit. Branch, Washington, DC, John Charles Cruden, U.S. Dept. of Justice, Environment & Natural Resources Div., Annandale, VA, for Kevin Gover, Dept. of Interior, defendants.

Mark E. Nagle, Robert Craig Lawrence, Scott Sutherland Harris, U.S. Attorney's Office, Washington, DC, J. Christopher Kohn, U.S. Dept. of Justice, Commercial Lit. Branch, Washington, DC, John Most, U.S. Dept. of Justice, Environment & Natural Resources Div., Washington, DC, Charles Walter Findlay, III, Washington, DC, Jo–Ann Shyloski, Barry Weiner, Washington, DC, Terry M. Petrie, U.S. Dept. of Justice, Denver, CO, Seth Brandon Shapiro, John Stemplewicz, U.S. Dept. of Justice, Civ. Div., Washington, DC, Herbert Lawrence Fenster, McKenna & Cuneo, LLP, Washington, DC, Sandra Peavler Spooner, Peter Blaze Miller, Cynthia L. Alexander, Amalia D. Kessler, Mathew J. Fader, U.S. Dept. of Justice, Commercial Lit. Branch, Washington, DC, John Charles Cruden, U.S. Dept. of Justice, Environment & Natural Resources Div., Annandale, VA, for Gale Norton, defendant.

Robert D. Luskin, Patton Boggs, L.L.P., Washington, DC, Seth Brandon Shapiro, U.S. Dept. of Justice, Civ. Div., Washington, DC, Peter Blaze Miller, Cynthia L. Alexander, Amalia D. Kessler, Mathew J. Fader, U.S. Dept. of Justice, Commercial Lit. Branch, Washington, DC, for John D. Leshy, Edward B. Cohen, defendants.

Elizabeth Wallace Fleming, Preston, Gates, Ellis & Rouvelas Meeds, Washington, DC, Seth Brandon Shapiro, U.S. Dept. of Justice, Civ. Div., Washington, DC, Peter Blaze Miller, Cynthia L. Alexander, Amalia D. Kessler, Mathew J. Fader, U.S. Dept. of Justice, Commercial Lit. Branch, Washington, DC, John Charles Cruden, U.S. Dept. of Justice, Environment & Nat-ural Resources Div., Annandale, VA, for Michael G. Rossetti, defendant.

B. Michael Rauh, Manatt, Phelps & Phillips, L.L.P., Washington, DC, for Neal McCaleb, defendant.

Lawrence H. Wechsler, Janis, Schuelke & Wexhsler, Washington, DC, for Eleni M. Constantine, non party.

Donald Michael Barnes, Seyfarth Shaw, Washington, DC, for Roberta McInerney, non party.

David Booth Beers, Shea & Gardner, Washington, DC, for James Regan, non party.

William Aaron Dobrovir, Warrenton, VA, for Daniel Mazella, non party.

Pamela J. Marple, Mannatt, Phelps & Phillips, Washington, DC, for Randall Lewis, non party.

Timothy Patrick Garren, U.S. Dept. of Justice, Washington, for U.S., non party.

Brian L. Ferrell, U.S. Dept. of Justice, Washington, DC, for Dept. of Treasury, non party.

Erik Lloyd Kitchen, Steptoe & Johnson, L.L.P., Washington, DC, for Ingrid D. Falanga, non party.

Martha Purcell Rogers, Ober, Kaler, Grimes & Shriver, Washington, DC, for Timothy S. Elliott, non party.

Michael R. Bromwich, Fried, Frank, Harris, Shriver & Jacobson, Washington, Amy Berman Jackson, Trout & Richards, P.L.L.C., Washington, DC, for Edith R. Blackwell, non party.

Roger Eric Zuckerman, Zuckerman, Spaeder, Goldstein, Taylor & Kolker, L.L.P., Washington, DC, for Robert Lamb, non party. Kathleen Elizabeth Voelker, Washington, DC, for James Douglas, non party.

Kathleen Elizabeth Voelker, Washington, DC, for James Douglas, non party.

Stephen M. Byers, Crowell & Moring, L.L.P., Washington, DC, for Dominic Nessi, non party.

Michael R. Bromwich, Fried, Frank, Harris, Shriver & Jacobson, Washington, DC, for M. Sharon Blackwell, non party.

Leslie B. Kiernan, Zuckerman, Spaeder, Goldstein, Taylor & Kolker, L.L.P., Washington, DC, for Hilda Manuel, non party.

L. Barrett Boss, Asbill, Junkin, Moffitt & Boss, Chartered, Washington, DC, for Steven Swanson, non party.

Plato Cacheris, Sydney Jean Hoffman, John Francis Hundley, law Offices of Plato Cacheris, Washington, DC, for John Berr, Glenn Schumaker, non parties.

Barbara Ann Van Gelder, Wiley, Rein & Fielding, Washington, DC, for James A. Eichner, non party.

William Holt Briggs, Jr., Ross, Dixon & Bell, L.L.P., Washington, DC, for Phillip A. Brooks, non party.

Thomas Edward Wilson, Berliner, Corcoran & Rowe, L.L.P., Washington, DC, for John S. Most, non party.

Mary Lou Soller, Miller & Chevalier, Chartered, Washington, DC, for Chester Mills, Terrance Virden, non parties.

Jeffrey David Robinson, Melissa Heitman McNiven, Baach, Robinson & Lewis, Washington, DC, Lois J. Schiffer, non party.

Dwight Phillip Bostwick, Comey, Boyd & Luskin, PC, Washington, DC, Melissa Heitman McNiven, Baach, Robinson & Lewis, Washington, DC, for Anne Shields, non party.

Larry Allen Nathans, Bennett & Nathans, L.L.P., Baltimore, MD, for David Shuey, non party.

John Kenneth Zwerling, Zwerling & Kemler, P.C., Alexandria, VA, for Terry Steele, non party.

Lisa Bondareff Kemler, Zwerling & Kemler, P.C., Alexandria, VA, for Deborah Maddox, non party.

Russell David Duncan, Lisa Ann Freiman Fishberg, Coburn & Schertler, Washington, DC, for John A. Bryson, David Shilton, non parties.

E. Lawrence Barcella, Jr., Paul, Hastings, Janofsky & Walker, L.L.P., Washington, DC, for Williams G. Myers, III, non party.

David Sidney Krakorr, Alessio D. Evangelista, Beverage & Daimond, P.C., Washington, DC, for Daryl W. White, non party.

Michael D. Goodstein, Resolution Law Group, PC, Washington, DC, for Tom C. Clark, II, non party.

Bradley Stuart Lui, Morrison & Foerster, LLP, McLean, VA, for Sabrina McCarthy, non party.

Stanley M. Brand, Andrew Dewald Herman, Brand & Frulla, P.C., Washington, DC, for Peter D. Coppelman, non party.

Marshall L. Matz, Olsson, Frank & Weeda, P.C., Washington, DC, Jefferson McClure Gray, Ober, Kaler, Grimes & Shriver, Baltimore, MD, for Kenneth Paquin, Kenneth Russel, non parties.

Alan Lee Balaran, Washington, DC, pro se.

Jonathan K. Tycko, Gibson, Dunn & Crutcher, L.L.P., Washington, DC, Richard Lee Cys, Davis Wright Tremaine, Washington, DC, for Dow Jones & Co., Inc., movant.

Christopher B. Mead, London & Mead, Washington, DC, for Kenneth F. Rossman, movant.

Albert Lee Bynum, pro se.

SECOND STATUS REPORT OF THE SPECIAL MASTER REGARDING THE SHUTDOWN AND RECONNECTION AND/OR RESUMPTION OF COMPUTER SYSTEMS AT THE DEPARTMENT OF THE INTERIOR

BALARAN, Special Master.

*Background*

On November 14, 2001, the Special Master filed the Report and Recommendation of the Special Master Regarding the Security of Trust Data at the Department of the Interior ("Special Master Report") chronicling Interior's failure to safeguard and secure individual Indian trust data. In response, the Court ordered defendants: (1) to "immediately disconnect from the Internet all information technology systems that house or provide access to individual Indian trust data"; and (2) to "immediately disconnect from the Internet all computers within the custody and control of the Department of the Interior, its employees and contractors, that have access to individual Indian trust data." Temporary Restraining Order ("TRO") dated December 5, 2001, at 2.

On December 17, 2001, the Court entered a second order that, in part, preserved the injunctive relief granted by the TRO and, in part, offered Interior several alternative methods by which it could reconnect and/or resume the operations of its technology systems. The Court held, in relevant part, that Interior,

(1) "may operate any information technology system that is not connected to the Internet, . . . following submission of reasonable assurances to the Special Master, and Interior shall not reconnect any information technology system to the Internet without the concurrence of the Special Master" (Order at 5) ("Provision 1");

(2) "may reconnect to the Internet any information technology system that does not house individual Indian trust data and that does not provide access to individual Indian trust data seventy-two (72) hours after providing actual notice with appropriate documentation to the Special Master and Plaintiffs' counsel or immediately upon concurrence of the Special Master" (Order at 5–6) ("Provision 2");

(3) "may reconnect to the Internet, for specified periods, any information technology system that houses or provides access to individual Indian trust data, for the limited purposes of" (a) "testing the security of the information technology systems," or (b) "performing those functions necessary to receive, account for, and distribute trust funds of appropriated funds, or to provide other necessary services." Under this provision, Interior would provide "at least seventy-two (72) hour notice" with "appropriate documentation" and shall provide its plan for the Special Master's review and inquiry (Order at 6) ("Provision 3"); and

(4) "may reconnect to the Internet any information technology system that houses or provides access to individual Indian trust data" upon "actual notice" with "appropriate documentation" which shall be given "at least seventy-two (72) hours before reconnecting" and shall provide its reconnection plan to the Special Master for his review and inquiry. Order at 7 ("Provision 4").

December 17 Order at 5–8.[1] The Court further ordered the Special Master to veri-

---

1. Although denominated a "consent order," the December 17 Order did not reflect an

fy compliance with the December 17 Order, as necessary, by interviewing Interior personnel or contractors and by conducting site visits "wherever technology systems or individual Indian trust data is housed or accessed". *Id.* at 7. Finally, the Court provided that the order be vacated once it "has determined that Interior Defendants are in full compliance" and "Interior's relevant information technology systems are in compliance with the applicable standards outlined in OMB Circular A–130." Order at 8.[2] *Id.* at 8.

*Requests Submitted Prior to the Filing of the First Report*

On January 15, 2002, the Special Master filed the First Status Report of the Special Master Regarding the Shutdown and Reconnection of Computer Systems at the Department of the Interior ("First Status Report"). The First Status Report discussed Interior's efforts to reconnect or recommence operation of those information technology ("IT") systems impacted by the December 17 Order. Interior, at that time, had requested that the Special Master consider the reconnection and/or resumption of operation of: (1) the Inte-grated Resources Management System ("IRMS") (December 17, 2001); (2) the Social Services Automated System ("SSAS") (December 17, 2001); (3) the Law Enforcement Watch Office (December 21, 2001); (4) the Office of Surface Mining ("OSM") systems (December 21, 2001); and (5) the Mineral Management Service ("MMS").[3]

On December 19 and 21, 2001, respectively, the Special Master approved Interior's request to recommence operation of SSAS and the Law Enforcement Watch Office. On January 22, 2002, approved Interior's request to reconnect OSM to the Internet and to recommence operation of IRMS.

*Second Status Report.*

As in the First Status Report, this Second Status Report will detail the posture of Interior's outstanding requests. In addition, it will address Interior's January 31, 2002 representations before the Court regarding the present status of its requests before the Special Master.

*Status of Current Requests.*

Since tendering its initial requests on December 17 and 21, 2001, Interior filed

---

agreement between the parties.

> MR. KOHN: First, we may be using consent order in two different ways. The consent order we have been talking about is one that the party against whom the relief lies is consent.
>
> THE COURT: Is consent.
>
> MR. KOHN: It's not a stipulated consent order.

Transcript dated December 17, 2001 at 939.

**2.** Circular No. A–130 provides uniform government-wide information resources management policies as required by the Paperwork Reduction Act of 1980, as amended by the Paperwork Reduction Act of 1995, 44 U.S.C. Chapter 35. In relevant part, this provision requires agencies to:

> (a) Ensure that information is protected commensurate with the risk and magnitude of the harm that would result from the loss, misuse, or unauthorized access to or modification of such information;
>
> (b) Limit the collection of information which identifies individuals to that which is legally authorized and necessary for the proper performance of agency functions;
>
> (c) Limit the sharing of information that identifies individuals or contains proprietary information to that which is legally authorized, and impose appropriate conditions on use where a continuing obligation to ensure the confidentiality of the information exists.

**3.** "[A]s a courtesy," Interior also advised the Special Master, on December 17, 2001, that it intended to recommence operation of the Trust Fund Accounting System ("TFAS") on the grounds that the Consent Order was not applicable to that system. December 17, 2001 Letter from Sandra P. Spooner to Alan L. Balaran at 1.

no requests with the Special Master until January 24, 2002 when it provided notice to the Special Master that the National Business Center in Reston, Virginia (NBC Reston) intended to reconnect its local area network pursuant to Provision 2 of the December 17 Order. On February 4 and 5, 2002, IBM proposes to assess Interior's request to reconnect NBC–Reston's internal network to the Internet and to forward its recommendations to the Special Master shortly thereafter.[4]

On January 24, 2002, Interior advised the Special Master of its intent to power up its Novell file and print server located in its Twin Cities field office pursuant to Provision 1 of the December 17 Order. To avoid any delay that might be associated with traveling to the Twin Cities, IBM will first attempt to connect from the Reston facility to the Twin Cities field office to check for Internet connectivity. Absent any unforeseen obstacles, the IBM team anticipates conducting this test on Feb. 5 or 6, 2002 and forwarding its recommendation to the Special Master shortly thereafter.

On January 25, 2002, Interior provided notice that its National Business Center, Office of Aircraft Services' (NBC/OAS) intent to reconnect to the Internet its information technology systems pursuant to Provision 2 of the December 17 Order.[5] To avoid any delay that might be associated with traveling to Boise, IBM will attempt to conduct a LAN connectivity test from the NBC–Reston facility. If unable to do so, IBM will dispatch a member of its team to Boise to conduct the same network scan that was conducted at NBC–Reston. Absent any unforeseen obstacles, the IBM team anticipates conducting this test on Feb. 5 or 6, 2002 and forwarding its recommendation to the Special Master shortly thereafter.

On January 24, 2002, Interior provided notice that, pursuant to Provision 3 of the December 17 Order, the Bureau of Indian Affairs "seeks to reconnect to the Internet for the limited purpose of configuring, testing, and qualifying its Firewalls and Intrusion Detection Systems (IDS) at its three Internet Points of Presence ('POP') at Reston, Virginia; Phoenix, Arizona; and Albuquerque, New Mexico."[6] The tests originally scheduled

---

4. Specifically, IBM proposes to: (1) ensure separation of NBC–Reston local network from BIANet LAN resources in Reston; (2) discover of any unaccounted for terminal/machine is connected to BIANet; and (3) map the overall architecture. These tests will utilize tools that are designed to provide a topology and inventory of the internal network. Once the topology/inventory is developed, IBM will compare the information with other Department information to see if any local machines are hooked up to BIANet.

5. IBM is seeking to validate the Boise LAN to ensure separation of OAS–Boise local network is separated from the BIANet LAN resources and to discover the existence of terminal or machine that may be connected to the BIANet.

6. As soon as it is given access, IBM proposes to test the firewall and IDS configurations so that the managed services provider for these devices (Predictive/RIPTEK) can validate and execute its service level agreement with the Department. IBM is proposing: (1) to ensure that Internet connectivity, which is needed to conduct the firewall and IDS test by the Department, will be restricted only to the firewall and IDS, and will not be permitted to reach internal systems. (At the conclusion of the test, IBM will verify that Internet connectivity is completely shut down.); and (2) to review the firewall and IDS policy sets. Reviewing these rules will give IBM an idea of what protections will be put in place to control access to BIANET once the firewall and IDS goes into full production. IBM anticipates then being able to determine, among other things, how the IDS tracks user policy violations, how it tracks abnormal activity patterns and how it prioritizes threat to its systems.

to commence on February 1, 2002 were delayed upon receipt of a communication from SAIC Hart Rossman indicating that Predictive Systems, Inc. and its sub-contractor RIPTECH needed three to five days to prepare for such a test. Absent any unforeseen obstacles, IBM anticipates being able to conduct this test on Feb. 5 or 6, 2002 and forwarding its recommendation to the Special Master shortly thereafter.

On January 26, 2002, Interior notified the Special Master that the National Park Service intends to reconnect its IT systems to the internet pursuant to Provision 1 of the December 17 Order. On January 28, 2002, the Special Master posed several questions to the agency regarding the procedures by which individual Indian trust data would be segregated from servers and terminals with access to the Internet.[7] On February 1, 2002, Interior provided responses to those questions. Simultaneous with the Special Master's review of these submissions[8], IBM proposes to conduct a network scan to ensure that NPS systems are disconnected from the BIANet and to verify that any servers and PCs that may contain trust data are disconnected from NPS' intranet. Absent any

unforeseen obstacles, IBM anticipates conducting these tests and reporting its recommendation to the Special Master shortly thereafter.

On January 28, 2002, Interior provided notice that the Bureau of Reclamation ("BOR") intended to reconnect its IT systems to the Internet pursuant to Provision 2 of the December 17 Order.[9] IBM and SAIC are currently scheduling a time to undertake these tests.

On January 28, 2002, Interior provided notice that the Bureau of Land Management intends to reconnect its IT systems to the Internet pursuant to Provision 2 of the December 17 Order. On January 29, 2002, Interior requested that the Special Master defer consideration of this request pending the inclusion of additional information.[10]

*Interior's January 31, 2002 Representations to the Court*

On January 31, 2002, Interior conveyed its frustration with the pace at which its requests have been adjudicated. As detailed below, it is the view of the Special Master that this frustration stems from a fundamental misunderstanding of the scope of the December 17 Order and the

---

7. Among the questions asked were: (1) what process was undertaken, and what criteria was employed, to determine whether a particular server or PC was likely to house Indian trust data (Declaration at ¶ 6, 7, 8); and (2) how Interior will update individual Indian trust data that has been removed from servers and PCs to other media (such as CD–ROMs). January 28, 2002 Letter from Alan L. Balaran to Matthew J. Fader.

8. The Special Master will also contact NPS field representative to ensure that individual Indian trust data that may have resided on its systems and computers has been transferred safely other media.

9. IBM proposes to verify that BOR servers and PCs that contain or that may contain

individual Indian trust data are physically disconnected from the BOR intranet. IBM further proposes to check the BOR WAN/LAN to ensure that these servers and PCs are not accessible from the internal network.

10. Interior requested this deferral notwithstanding its representation that,

> February is the fire season, and the Bureau of Land Management uses the internet to allocate its resources to fight fires, to decide which fires are bigger and therefore need more aircraft, or more firefighters or whatever, and that's not available to them now, and you know, hopefully we won't have a serious loss of property or life, but certainly, from our perspective we take that, you know, as a really serious problem.

Transcript at 3164.

responsibilities that Order imposes on the Special Master.

On one level, the Special Master agrees with Interior's perspective that the Consent Order anticipated a process,

> whereby the Interior Department would do the work that it needed to do to ensure that for one of the four listed reasons in the consent order, it could operate its—certain of its information technology systems without danger, undue danger, undue danger to individual Indian trust data. And [that] Interior would do its work to see what it could do, either by segregating individual Indian trust data or by coming off the Internet, or some more hybrid kind of proposal to present that proposal to the Special Master, and that the Special Master, after that, would review [its] proposal and see if it was adequate.

January 31, 2001 Transcript at 3160–61.

That being said, the Special Master finds puzzling the fact that Interior

> did not envision that in addition to looking at our documentation to see if the proposal we made was accurate, including whatever declarations we submitted, the Special Master has begun to look at the individual systems to ensure himself, with his own investigation, that the systems—that the individual Indian trust data is protected or that we are in fact off the internet.

*Id.* at 3161.

Given its disgraceful legacy protecting Indian trust data, Interior could not realistically have envisioned that the Special Master would not exhaust every reason-

able avenue to assure himself and the Court that Indian trust data was as secure as present circumstances allow. The December 17 Order, by its terms, requires "the Special Master [to] *verify compliance* with this Consent Order and [ ] *conduct interviews* with Interior personnel or contractors or *conduct site visits* wherever information technology systems or individual Indian trust data is housed or accessed." December 17 Order at 7 (emphasis added). Indeed, the Special Master's obligation to conduct independent investigations stems directly from the August 12, 1999 Order empowering the Special Master to "oversee the Interior Department's retention and protection from destruction of IIM Records through, among other things, on-site visits to any location where IIM Records are not being protected from destruction or threatened destruction." It can not rationally be argued that an inquiry into the execrable conditions described in the Special Master Report (*i.e.*, the lack of perimeter protection, trained staff, hardware/software capable of monitoring network activity and security personnel) does not falls squarely within the scope of the Special Master's responsibility.[11]

That said, it is difficult to comprehend Interior's frustration with the Special Master's decision, for example, to independently verify TFAS' disconnection from the Internet rather than blindly accept Etta Frank's one-line statement issued on behalf of Division of Trust Fund Systems Robert McKenna that "The Trust Funds Accounting System (TFAS) is Not Con-

---

11. It must be emphasized that "Interior did not argue, even, that any of the Special Master's findings were clearly erroneous" (Transcript dated January 15, 2002 at 3082) and that it chose not to refute the Special Master's conclusion that the deplorable condition was "inexcusable" (Special Master Report at 143)

or that for years, Interior was aware of these deficiencies yet took no action (*id.* at 143–44) or that its conduct violated public laws and federal regulations, (*id.* at 144) or that it allocated no resources to remedy this problem (*id.* at 145–50).

nected to the Internet."[12] It is similarly inconceivable that Interior would have expected the Special Master to permit a key system such as IRMS to be reconnected based on a one-line affirmation from Acting Chief Information Officer Debbie L. Clark.[13]

Supporting statements such as these do not relieve the Special Master of his obligation to conduct an independent inquiry. This is so for two reasons. First, the decentralized nature of Interior's IT systems and the vast number of servers, terminals and PCs impacted by the Order of December 17 requires more than generalized assurances. Interior's request to reconnect OSM, for example, cites to Glenda Owens' declaration that, "was made on the basis of *reasonable inquiry* .... because there is no practical way, *given the substantial volumes of information contained in some systems,* to evaluate every document or data set stored in each database

individually, *the certifications are based on a standard of reasonableness.*" Letter dated December 21, 2001 Letter from Sandra P. Spooner to Alan L. Balaran (emphasis added). Unfortunately, "reasonable inquiries,"without more, may not be sufficient in all instances and can not supplant a fiduciary's obligation to independently and thoroughly investigate. *See In re Unisys Sav. Plan,* 74 F.3d 420, 434 (3rd Cir. 1996)("the most basic of [a trustee's] investment fiduciary duties [is] the duty to conduct an independent investigation into the merits of a particular investment."). *See also* Austin W. Scott, THE FIDUCIARY PRINCIPLE, 37 Cal. L.Rev. 539, 541 (1949) (the greater the fiduciary's authority, the greater the duty).

Second, on more than one occasion in this litigation, declarations have not fared well under scrutiny, thus rendering it necessary to engage in a more critical examination. *See, e.g.,* October 1, 2001 Opinion

12. The Special Master would have been well justified to insist that TFAS be shut down until it could be independently verified that the system was, in fact, disconnected from the Internet. Instead, TFAS was allowed to remain in operation pending the outcome of an investigation.

13. On that score, Interior erroneously suggests that, "in the absence of notification that [the Special Master] require additional documentation, Interior is permitted to reconnect [the NBC/OAS systems] to the Internet on the evening of January 28" (January 25 2002 Letter from Sandra P. Spooner to Alan L. Balaran at 2); or that it may power up its Novell file and print servers located in its Twin Cities field office "without [the Special Master's] concurrence, after providing [ ] reasonable assurance of disconnection from the Internet" (Letter dated January 24, 2002 from Sandra P. Spooner to Alan L. Balaran at 1); or that the Consent Order is not applicable to Interior's unilateral decision to recommence operation of TFAS (Letter dated December 17, 2001 from Sandra P. Spooner to Alan L. Balaran at 1); or that, "in the absence of notification that [the Special Master] require[s] additional documentation" Interior

may reconnect NBC Reston's Information Technology Systems to the Internet (Letter dated January 24, 2002 from Sandra P. Spooner to Alan L. Balaran at 2); or that "in the absence of notification that [the Special Master] require[s] additional documentation, Interior is permitted to reconnect [BOR's] systems to the Internet" (Letter dated January 28, 2002 from Sandra P. Spooner to Alan L. Balaran at 2); or that "in the absence of notification that [the Special Master] require[s] additional documentation, Interior is permitted to reconnect [the National Park's] systems to the Internet" (Letter dated January 26, 2002 from Matthew J. Fader to Alan L. Balaran at 2); or that "in the absence of notification that you require additional documentation, Interior is permitted to reconnect [BLM's] systems to the Internet" (Letter dated January 28, 2002 from Sandra P. Spooner to Alan L. Balaran). This Report will hopefully disabuse Interior of these notions. The Special Master will not approve the reconnection and/or resumption of operations of any system without adequate independent verification.

of the Special Master regarding Plaintiffs' Motion For Order To Show Cause Why Secretary Norton And Her Counsel Should Not Be Held In Contempt And For Sanctions For Violating The Special Master's February 8, 2001 Order And The Court's Orders Of February 24, 1999 and August 12, 1999; and the October 28, 2001 Supplement thereto. This is not to cast aspersions on any of the declarations submitted in support of the instant requests or to suggest that the declarants have been less than scrupulously honest. The reality is, however, that these declarations often stand on the shoulders of certifications that, in turn, rely on the representations of hundreds, if not thousands, of employees. The stakes are simply too high for the Special Master not to conduct his own investigation to reasonably verify these statements.

Finally, Interior's tepid reception of the Special Master's "own investigations" (January 31, 2002 Transcript at 3161), suggests a sea change from the enthusiasm with which it initially embraced the Special Master's decision to retain IBM as an independent consultant:

> THE COURT: I will say the Special Master gave me a briefing when I left the bench yesterday, and he told me about this expert that he's retained to talk to your expert, and that he was hoping that he could approve that by late today.

> MS. SPOONER: That would be—that would be very wonderful, Your Honor. *We are very pleased that the Special Master has retained an expert.*

Transcript dated January 9, 2002 at 2272 (emphasis added).

Notwithstanding what appears to be a shift in position vis a vis the Special Master's retention of an expert, IBM will continue to conduct investigations in conjunction with the Special Master.

*The Special Master's Response to Interior's Requests*

Similarly perplexing is Interior's representation that it has

> gotten into a system that's taking an extremely long time, because what we are doing is trying to reach, if not a state of perfection, at least a state where absolutely no stone is unturned, so that, you know,—and certainly we have tried to do that.

Transcript dated January 31, 2002 at 3162.

As demonstrated below, responses to Interior's requests have not taken "an extremely long time" and have not been held to a standard of "perfection."

*Response to Interior's December Requests.*

While the time it has taken to open Interior's IT systems may appear insufferable to the agency, the suggestion that the process of reconnecting or recommencing operation of IT systems has taken an "extremely long time" simply does not stand up to review. Permission to open both SSAS and Law Enforcement was granted within two days of being requested. Once Glenda Owens submitted a second declaration on Friday, January 18, 2002 that adequately addressed the concerns expressed by the Special Master in the First Status Report, approval was given to recommence operation of OSM on Tuesday, January 22, 2002.[14] Regarding Interior's request to recommence operation of its IRMS sys-

---

14. The reasons for the month delay in approving Interior's request are set out in the First Status Report at 9–13. There, the Special Master sought clarification of the testimony of Office of the Special Trustee Principal Director Tom Thompson as well as of the decla-

rations of OSM Acting Director Glenda Owens and Deputy Assistant Secretary for Indian Affairs James McDivitt. The Special Master concluded, after reviewing testimony and declarations in support of Interior's request that, "[s]tatements are made that are later recanted

tems, there was a need to proceed cautiously commensurate with the fact that this system processes data that includes individual account information, property ownership, and leasing transactions that result in payment to individual Indians for farming and grazing lands, oil gas and mineral sales and per capita payments. (And, as stated, earlier, a one-line affirmation from the Acting Chief Information Officer was facially inadequate to grant Interior's request.) Nevertheless, less than two weeks after IBM was retained by the Special Master, protocols were put into place to allow IBM access to all necessary facilities.[15] On January 22, 2002, the IBM team traveled to Reston, conducted router configuration and connectivity tests and advised the Special Master that IRMS was, in fact, disconnected from the Internet. That very day, the Special Master informed Interior Associate Deputy Secretary James Cason that Interior may recommence operation of that system.

Regarding MMS, the process underway to reconnect those systems *has* taken an

"extremely long time." However, the responsibility for any delay falls squarely on Interior. When the agency first requested that MMS be reconnected, the Special Master asked to review the documents upon which SAIC contractor Hart Rossman based his opinion that the system was safe for reconnection. Mr. Rossman responded that he did not believe that the Special Master and his contractor would be permitted to review the same security information to which he was readily given access. And, in fact, Mr. Rossman was correct. It would be difficult to imagine a greater abrogation of responsibility than for the Special Master to have simply accepted Mr. Rossman's reassurance that all was "safe" and allowed a system teeming with sensitive Indian trust data to be reconnected to the Internet without first reviewing all relevant security records. To expedite the process, however, the Special Master, on January 10, 2002 imposed an onerously limiting protective order on plaintiffs and on his own contractor.[16] Notwithstanding, Interior did not produce

and corrected. Explanations are given that appear inconsistent with others." First Status Report at 12. Interior took issue with these findings and responded that "no statement was made that was later recanted; no explanation was inconsistent with another." January 18, 2002 Letter from Sandra P. Spooner to Alan L. Balaran at 1. While the Special Master disagrees with Interior's assessment that Mr. Thompson's January 9, 2002 Declaration did not constitute a recantation, *i.e.*, a withdrawal of his January 7, 2002 testimony, there is no reason not to credit his statement that he misunderstood the question presented to him during trial. Beyond this, Ms. Owens has adequately explained those portions of her declaration that initially troubled the Special Master, and the Special Master credits her testimony that "No data from OSM, electronic or otherwise, makes its way into the individual Indian money (IIM) disbursement cycle" January 18, 2002 Declaration of Glenda Owens at ¶ 11.

15. *See* Letter dated January 18, 2002 from Alan L. Balaran to Matthew J. Fader:
I have received your letter dated January 17, 2002 memorializing our agreement that it was necessary to take certain steps prior to recommencing operation of the Integrated Records Management System. One of those steps would require Interior to provide access to Ms. Daly (or his associates) to Interior facilities so that he may confirm that IRMS is disconnected from the Internet. Mr. Daly would be accompanied by a DOJ attorney, an SAIC representative and plaintiffs' counsel (should they wish to attend); and no Interior employee, with the exception of Assistant Deputy Secretary James Cason will be informed in advance of these visits.

16. It has recently come to light that Interior's contractor SAIC was permitted to view MMS system security plans without being held to nearly the same stringent non-disclosure requirements as was imposed on the Special

**12**

any responsive documents until January 31, 2002.[17]

## Standard of Review

Finally, Interior's concern that it might be tethered to an unrealistic standard of review is unsupported by the record. If the Special Master insisted on "perfection" or a "state of the art" security system, Interior would be in the identical position it was on December 6, 2001—the day following the Court's granting of plaintiffs' request for a temporary restraining order. Rather, as Interior is well aware, there has long been a recognition by the Special Master that OMB A-130 compliance is simply not possible in the near future given Interior's current budget, resources and infrastructure (*see* fn. 2, *supra*). The Special Master has accepted "Interior Defendants' represent[ation] that they intend to bring relevant individual Indian trust information technology systems into compliance with applicable standards outlined in OMB Circular A-130," (December 17 Order at 5), and has repeatedly emphasized that immediate reconnection and/or resumption of operations will not hinge on full compliance. That being said, permitting Interior time to ramp up to achieve ultimate A-130 compliance does not mean that immediate reconnection and/or resumption of operations will be permitted without adequate safeguards.

## Conclusion

Interior is correct when it asserts that "the consent order meant that we would provide the plan, the reasonable assurances to the Special Master, and he would

tell us whether our proposal, given the affidavits and so forth that we gave him, were reasonable assurances" (Transcript at 3163). What constitutes "reasonable assurance" pursuant to Provision 1 of the December 17 Order (or "appropriate documentation" pursuant to Provisions 2, 3 and 4), however, must remain a decision within the province of the Special Master and the Court. The historical lack of protections afforded individual Indian trust data removes Interior from consideration as the arbiter of what is "reasonable" (or "appropriate").

The process of reconnecting and resuming operations of IT systems is a painstaking one that understandably frustrates all parties and the Court. Interior has consistently been responsive to the requests of the Special Master for more information and for greater assurances. The Special Master remains in constant contact with his contractors so that issues and problems that arise may be addressed expeditiously. With individual Indian trust data at risk, however, caution is required. The process contemplated by the Court can not, and will not, be guided by political expediency. The December 17 Order is designed to verify that Indian trust data is being protected after years of neglect. The Office of the Special Master remains committed to working with Interior to discharge the letter and spirit of that order—nothing more, and, certainly, nothing less.

---

Master's contractor IBM. It was Interior contractor Accenture's insistence that IBM adhere to a protective agreement with provisions considerably more restrictive than those imposed on SAIC that has significantly delayed this process and resulted in no documents being produced until January 31, 2002. Future attempts by Interior or its contractors to impose harsher protocols on the Special

Master, his experts and plaintiffs than on SAIC, its spokespersons and defendants will effectively remove such a request from consideration.

17. Barring any unforeseen delays, IBM anticipates filling its recommendation concerning MMS with the Special Master within the week.